UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NTE LLC, a Nevada limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>KENNY CONSTRUCTION COMPANY, an Illinois corporation; NALCOR ENERGY, a Canadian corporation; AMEREN CORPORATION, a Missouri corporation; ELECTRIC TRANSMISSION TEXAS LLC, a Delaware limited liability company; ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation; and DOE SAAS COMPANY,<br><br>Defendants. | No. 14 C 9558<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

**I. Overview**

Plaintiff NTE LLC ("NTE"), a web-based supply chain solution provider, seeks a preliminary injunction against Defendants Kenny Construction Company ("Kenny"), Nalcor Energy, Ameren Corporation, Electric Transmission Texas LLC, and Arizona Public Service Company, and Doe SAAS Company ("Defendants") based on claims of copyright infringement under 17 U.S.C. § 101 et seq. (Counts I-III), breach of contract (Count IV), and misappropriation (Count V). Plaintiffs seeks to enjoin Defendants from (1) using NTE proprietary data; (2) using any reports or documents reflecting the NTE proprietary data; (3) encouraging or facilitating others to use the NTE proprietary data or any information derived therefrom; (4) copying, retrieving, transmitting, disseminating or otherwise maintaining the NTE proprietary data or any information derived therefrom; (5) using NTE's proprietary and copyrighted data compilation;

1

and (6) developing any system or software that uses or requires the NTE proprietary data or NTE's data compilation. In sum, NTE seeks a preliminary injunction ordering Kenny Construction and Kenny Defendants to stop using NTE-generated data, particularly NTE-generated historical data, to its benefit.

On December 4, 2014 and January 21, 2015, evidentiary hearings were held on NTE's motion for a preliminary injunction at which both Plaintiff and Defendants presented evidence and examined several witnesses, including Robert Rocque and David Thompson of NTE and Peter Oswald and William Perrich of Kenny Construction Company. Additionally, the Court considered NTE's complaint, motion, memorandum in support, and exhibits, Defendants' oppositions, the parties' supplemental submissions, and arguments of counsel. For the following reasons, Plaintiff's motion is denied.

## II. Statement of Facts

Kenny Construction, a wholly-owned subsidiary of the Granite Construction Company ("Granite"), first subscribed to NTE's cloud-based software system (the "Software Suite") in 2011 to acquire logistical support in the construction of power line transmission towers, solar power transmission projects, inventory management, and wind energy transmission projects. Kenny had previously used an internal "Access Database" system, but chose to use NTE's Software Suite for its more robust and portable management of Kenny's supply chain.

Kenny Construction and NTE's relationship is governed by the Master Professional Service Agreement ("Service Agreement"), a six-month contract entered into on January 8, 2014, with the right to extend for an additional six-month period. Pursuant to the Service Agreement, Kenny Construction paid NTE a monthly subscription and support fee of approximately $130,000 for hosting and licensing the Software Suite. Paragraph 7 of the Service

Agreement expressly reserves ownership of all intellectual property, including data and reports generated by NTE, to NTE, while Kenny maintained rights to any data it supplied to NTE.

Kenny, at varying times, operated four ongoing projects on the Software Suite: Nalcor Energy ("Nalcor"), Ameren Corporation ("Ameren"), Electric Transmission Texas LLC ("ETT"), and Arizona Public Service Company ("APS") (collectively the "Kenny Construction Defendants"). For each of these projects, Kenny Construction provided NTE with data in "CSV" files falling into three categories: (1) initial purchase orders; (2) a description of types of items Kenny may have in inventory ("item master"); and (3) a list of towers and the main item master components that make up the towers. NTE corrected for any formatting issues and imported the data into NTE's Software Suite, which could then be used to generate reports. The Software Suite analyzed and manipulated NTE-generated data ("NTE Proprietary Data") contained in database tables with NTE-generated identifiers (e.g., barcodes, date and time stamps, dispositions throughout the lifecycle of each project), along with other derived information to achieve its functionality.

NTE asserts that Kenny shared screenshots of NTE proprietary information, in violation of the Service Agreement, in seeking to get bids from two competing software vendors. Upon returning the contested proprietary information, as requested by NTE, Kenny unsuccessfully attempted to acquire ownership in the NTE proprietary data through an amendment and extension of the Service Agreement. Kenny claimed that after NTE disrupted Kenny's service, Kenny became aware of its reliance on the use of the Software Suite to run the daily operations of its various projects and thus Kenny's resulting vulnerability to NTE. To protect itself, in or around July 2014, Kenny deployed employee Mr. Peter Oswald to begin developing its own in-house solution to manage the supply chain for its power line transmission

tower projects, culminating in the "KCC Internal System."

To populate data into the KCC Internal System for the ETT project, Kenny employees generated and printed item inventory reports from the NTE system that displayed each transaction associated with a barcode. Kenny employees then created a new barcode, different than the NTE barcode, for each piece of equipment and updated each barcode with information from the item inventory report given to NTE by Kenny and owned by Kenny—location, date received, date moved, or date issued—for each bar code. Kenny claims that it did not input any information from the remaining columns of data for each bar code transaction contained in the barcode summary report for the ETT project. NTE, however, claims that the date of the most current receipt was NTE proprietary data pulled directly from the inventory report for the ETT project.

Kenny Construction denies using extracted data for the projects with Ameren, Arizona Public Service Company, or Nalcor Energy, reasoning that they did not require historical data that had been inputted into the Software Suite. NTE, however, asserts that Ameren entered historical data from NTE into their own system and that Nalcor is still directly accessing NTE proprietary data relating to the Nalcor project from the Software Suite without a license or subscription to NTE.

## III. Discussion

A court may issue a preliminary injunction enjoining copyright infringement if the moving party demonstrates (1) a likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that it will suffer irreparable harm if preliminary relief is denied. *Abbott Labs. v. Mead Johnson Co.,* 971 F.2d 6, 11 (7th Cir. 1992); s*ee also Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir.2000). If the movant passes this threshold, the court

must then balance any irreparable harm that will result to the nonmoving party and whether the injunction is in the public interest. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.,* 302 F.3d 1352, 1356 (Fed.Cir.2002); *Eli Lilly,* 233 F.3d at 461. Finally, the court should use a sliding-scale approach to weigh all four of the factors against each other, so that the more likely that a plaintiff will succeed on the merits, the less the balance of harms needs to weigh in the plaintiff's favor. *Eli Lilly,* 233 F.3d at 461; *see also Amazon.com, Inc. v. Barnesandnoble.com, Inc.,* 239 F.3d 1343, 1350 (Fed.Cir.2001).

1. Likelihood of success on the merits

NTE seeks relief based upon (1) copyright infringement of NTE proprietary data; (2) breach of contract for appropriating NTE proprietary data; and (3) misappropriation and unfair competition with regards to benefiting from the NTE proprietary data. NTE's claims center on whether Kenny used NTE proprietary data in violation of the Service Agreement and in violation of copyright law. To satisfy that it is likely to succeed on the merits, NTE need only demonstrate a "greater than negligible chance of winning[.]" *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 804 (7th Cir.2002).

NTE presented evidence that ETT and Ameren stopped using the NTE-monitored communities for managing supply-chain activities and that ETT is instead using Kenny's software system. Because Kenny requires historical data about the life cycle of its inventory from the past three years it used the Software Suite, NTE alleges that Kenny's new system cannot function without use of NTE proprietary data or NTE's copyrighted data compilation. While Kenny maintains that it did not have access to NTE's proprietary software to be able to extract proprietary information, Kenny did have access to the Software Suite through a web browser that allowed users to view reports and other information generated by the Software

5

Suite. To that end, Kenny has admitted to using NTE's inventory report and inputting at least some historical data from NTE-generated reports into Kenny's software system, including the date an item was most recently received. While questions certainly remain regarding the scope of NTE's copyright and the data used by Kenny, NTE has met the minimum standard of likelihood of success on the question of breach of the Servicing Agreement and copyright infringement.

2. Irreparable Harm

NTE can only receive the equitable remedy of preliminary injunction if it will suffer irreparable harm—that is, harm that cannot be prevented or fully rectified through money damages and/or injunction at the final judgment—if it does not receive preliminary relief. *Abbott Laboratories*, 971 F.2d at FN 6 (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir.1984)).

NTE's claims are based on Kenny, a former customer, unlawfully taking valuable proprietary data owned by NTE and using that data in its own business for profit. NTE maintains that Kenny may either (1) access and use its proprietary data if it continues to pay the $130,000 monthly servicing fees; or, alternatively, (2) stop using NTE's system and proprietary data. NTE argued, "[w]e're not claiming that they can't stop using our system. We have no hold on them to make them use our system forever. Nor can we stop them from creating a new system and starting from scratch. But that's not what they did, because they can't do that." NTE continued, "[t]hey can't do that because when you look at the life cycle of these projects [], they need to know where a particular item was at any point in time, historically."

To that end, NTE argues that Kenny's projects have a limited lifespan and that NTE's proprietary data, particularly historical data, can become stale over time and diminish in value at an increasing rate. NTE claims that it should be able to exploit the value of this data while it is

able to do so. NTE further appears to argue that if Kenny is allowed to use the proprietary data in its own system until a decision is made on the merits, then NTE will no longer have the most recent data, and the data it has will become less valuable as it becomes less timely. Based on this scenario, if NTE were to prevail on the merits at a future date, Kenny could compensate NTE for the damages from the intervening months; moving forward, however, NTE would no longer have a hold over data that would require Kenny to pay for access to the Software Suite. Rather, Kenny would likely continue to use its own system, which then would contain the most up-to-date data. This, NTE claims, is evidence that NTE would be irreparably harmed by the permanent loss of once valuable data (e.g., data of when parts are received) if NTE were to prevail on the merits at a future date. Therefore, the only way to preserve NTE's intellectual property, NTE claims, is through preliminary injunction.

To the extent that NTE is correct about the effect of a disruption of service on the value of NTE's proprietary data, it reveals a tactically clever but odd characteristic of NTE's arrangement with Kenny: NTE's servicing of Kenny's inventory necessarily perpetuates Kenny's reliance on NTE and NTE's proprietary data that would result in the near impossibility of a termination of NTE's services. This potential loss of business in the future is not, however, harm to NTE for which it is entitled to receive compensation. That Kenny could halt NTE's claims by making a fixed monthly payment certainly supports a finding that if NTE were to prevail on the merits of its breach of contract, copyright infringement, and appropriation claims, it could be fully compensated with monetary damages and any harm it would suffer would not be irreparable.

3. Adequate Remedy at Law

The absence of an adequate remedy at law is a precondition to any form of equitable

relief. To demonstrate that an award of damages at the end of trial would be inadequate, a plaintiff need only show that an award would be seriously deficient as a remedy for the harm suffered, not wholly ineffectual. *Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386 (7th Cir.1984). The question, then, is whether the plaintiff will be made whole if he prevails on the merits and is awarded damages. *Id*. at 386.

As previously mentioned, NTE argues that, because Kenny projects have a limited lifespan, the NTE proprietary data can quickly become stale, therefore NTE must be able to exploit the value of the data with customers while possible. Further, NTE claims to have invested more than $1 million in customizing the Software Suite to meet Kenny's needs since 2011. All of these alleged losses are calculable and compensable through monetary damages at law. Plaintiff has an adequate remedy at law.

4. Balance of Harms and Public Interest

NTE has not met the necessary threshold for a preliminary injunction and our inquiry may end here. Nonetheless, I will assess the balance of harm between Defendant and NTE that would result from granting equitable relief, to wit, whether the harm to Defendants of granting preliminary relief would outweigh the harm to NTE of denying such relief. Notwithstanding the potential harm to NTE, it is the irreparable harm to Defendants if the injunction were issued that would tip the balance against its issuance.

Kenny manages large-scale electrical infrastructure projects, including between $3 and 4 million in material for a $500 million project run by ETT. Kenny additionally manages $100 million in material for approximately 92 individual projects with Ameren and $10 million in material for Arizona Public Service Company. Kenny claims that a preliminary injunction preventing Kenny from using their software would directly impact the delivery of materials for

those projects, bringing all of these projects to a standstill and delaying the electrification of underserved areas of the United States. As an initial matter, ETT seeks to protect vulnerable towns near the Gulf Coast by building an improved power system, not to newly electrify currently un-served areas—an arguably small, but significant difference. In any case, while enjoining Defendants from using NTE proprietary data could potentially disrupt the operation of these energy projects, which could affect Kenny's clients and potentially the general population, it is highly unlikely that ETT would be required to entirely halt production since Kenny manages only a small portion of the ETT project. More likely, an injunction would lead to increased costs and inconvenience. NTE maintains that it would allow Kenny and its utility customers to continue to manage their tower line projects and produce power for the public. If I were to grant an injunction, Defendants would likely find a way to continue its projects, albeit at an increased cost and some inconvenience, and would not be irreparably harmed.

On the other hand, NTE claims that the public interest in protecting creative endeavors, as identified in the Copyright Act, as well as in stopping unethical business conduct weighs in favor of an injunction. NTE argues that it has invested close to twenty years in developing its supply-chain system and spent thousands of hours customizing its system specifically for Kenny. NTE claims that creating and managing the NTE proprietary data is the backbone of NTE's business model and that allowing clients to take it would be catastrophic to NTE's business. Kenny argues that NTE has not clearly identified the scope of any copyright protection it has over its data, and, in any case, copyright law is intended to protect only creativity—not underlying facts. NTE additionally contends that it will lose its competitive position in the market if competitors have access to NTE's metrics and are able to take customers from NTE. NTE maintains that other third parties may follow Kenny's approach and misappropriate NTE's

9

proprietary data to avoid the on-going license fees. It claims that the only means for NTE to recoup its investment and produce income is through collection of its subscription revenue.

The potential harm faced by both Defendants and NTE reveals, again, that any potential harm to NTE can be fully compensated by monetary damages. To the extent the balance of harms tilts in any direction—here, only slightly—it is toward the public's interest in continuing the ongoing utility projects. Allowing NTE to continue its business as it has been and compensating it for any incurred loss causes less disruption than requiring Kenny to stop using allegedly proprietary data while in the process of building. There is little support for issuing a preliminary injunction against Defendants' use of NTE's proprietary data, and the injunction with regard to Kenny Construction will be denied.

## IV. Conclusion

For the foregoing reasons, Plaintiff's motion to enjoin Defendants from using potentially protected data is denied.

ENTER:

*James B. Zagel*

James B. Zagel
United States District Judge

DATE: February 4, 2015