# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NTE, LLC, <br><br> Plaintiff, <br><br> v. <br><br> KENNY CONSTRUCTION COMPANY, an Illinois corporation; NALCOR ENERGY, a Canadian corporation; AMEREN CORPORATION, a Missouri corporation; ELECTRIC TRANSMISSION TEXAS LLC, a Delaware limited liability company; ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation; and DOE SAAS COMPANY, <br><br> Defendants. | No. 14 C 9558 <br> Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Plaintiff NTE, LLC ("NTE") filed this copyright infringement suit against several of its former clients, including Defendant and movant Kenny Construction Company ("Kenny") on December 1, 2014. Kenny has moved for summary judgment on the seven counts of the First Amended Complaint in which Kenny is involved, namely: Count I (direct copyright infringement), Count II (contributory copyright infringement), Count IV (breach of contract—proprietary data), Count V (misappropriation), Count VI (breach of contract—payment), Count VII (unjust enrichment), and Count VIII (violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030)). For the following reasons, Kenny's motion is granted in part and denied in part.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A

1

genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether any genuine fact issue exists, the court must assess the proof as presented in the record, including depositions, answers to interrogatories, admissions, and affidavits, to view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Fed. R. Civ. P. 56(c); *Scott v. Harris,* 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 704 (7th Cir. 2011). If a claim or defense is factually unsupported, the court should dispose of it at the summary judgment stage. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. In response, the non-moving party cannot rest on bare pleadings but must designate specific material facts showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548; *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 598 (7th Cir.2000).

## BACKGROUND

### I. The Parties' Relationship

NTE is an Illinois-based software company that provides its clients with computer systems to improve their supply chain efficiencies. Kenny is an Illinois corporation and wholly-owned subsidiary of Granite Construction, Inc. Kenny performs logistical management for power transmission projects, including managing the delivery of parts and equipment used in those projects.

In January 2011, Kenny contracted with NTE to develop logistical management software that would help Kenny track such information as the location and type of material used in their construction projects. Kenny manually inputted three types of information into the NTE database for each utility project: 1) a "material hierarchy," 2) a "tower makeup," and 3) the "purchase order input" for that

material. It is undisputed that this raw data belonged to Kenny. It also undisputed that this raw data alone did not indicate what materials actually existed at a particular job site.

Using the files input by Kenny, NTE's software then selected, arranged, and organized the data using proprietary bar code scanners. These bar codes allowed NTE to track the materials at Kenny's various job sites and create tables and charts for Kenny's use. Kenny's Area Manager for the Logistics Solution Team, William Perrich, referred to the bar code identification system as "the head of the fish . . . that all the other information about a particular item in inventory is centered around," acknowledging the bar code system's critical role in enabling Kenny to track its inventory.

NTE received a Certificate of Registration from the Copyright Office on November 28, 2014. The copyright encompasses proprietary data including NTE's barcode identifiers, NTE's selection and arrangement of information, and the resulting Item Inventory Reports.

## II. The Copyright Dispute

Both parties agree that in July 2014, Kenny began developing its own tracking software system ("the KCC Internal System"). In a bidding process during this time, Kenny provided screen shots and data from the NTE database to NTE competitors, at which point NTE temporarily interrupted Kenny's service. The parties' statements of facts significantly diverge at this point. According to Kenny, on several occasions NTE's service suffered "serious lag times when pulling and exporting data," and required three to four weeks for each new report or coding change. NTE also locked Kenny out of its system in April 2014, following a dispute between the parties (a fact on which both sides agree.) Kenny explains that it was its dissatisfaction with NTE's product that prompted Kenny to recruit programmer Peter Oswald ("Oswald") to design the KCC Internal System. Kenny asserts that Oswald was not familiar with NTE's software, had no access to the NTE system, and received no guidance as to how to design the new system. Moreover, Kenny says it implemented controls to prevent all personnel working

3

on the new system from accessing or obtaining information from NTE's system. While Kenny had access to NTE's Software Suite through a web browser that allowed users to view reports and other NTE-generated information, Oswald himself "did not receive any screen shots, reports, source code, direction in the types of software to use, direction in the type of database system to use, direction in the type of hardware to use, process flow, work flows, or any guidance as to how to link the data, or configure the database queries."

Rather, Kenny says it explained to Oswald the structure and operations of its projects, including an outline of the supply chain, materials production, and construction phases. Kenny then provided Oswald with a list of requirements for its software system (not containing any software code, sample charts, or screen shots) and Oswald designed the new system to those specifications. Oswald and two other programmers then developed the design from scratch, resulting in a system that Kenny considers "significantly better and different than NTE's Software Suite." Kenny contends this system is entirely independent of and does not rely on NTE's system, though Kenny did admit that for historical data—that is, any tracking information that pre-dates the implementation of the KCC Internal System—the new system required old data to be input from NTE-generated reports.

In November 2014, Kenny transitioned its clients from the NTE system to the new Kenny software. Kenny asserts that it conducted a "blind inventory" to explain the transition to two of its clients, Ameren and APS. Kenny claims that transition did not involve the use of any information from the NTE system, but acknowledges that in November 2014, while still authorized to access NTE's system, Kenny printed an item inventory report and uploaded factual information from the report into the KCC Internal System. Kenny's counsel explained that Kenny extracted "approximately 200,000 pieces of [individual] data" from the NTE system and hand-entered them into Kenny's system, but maintains that this only applied to data that belongs to Kenny, not the copyrighted compilation

belonging to NTE. Kenny's position as described by William Perrich is that the KCC Internal System "is a completely new system that was designed without any input or reliance on the NTE Software Suite."

NTE's story differs from Kenny's on numerous key points. First, NTE denies any recurring performance issues with its software, claiming that Kenny only experienced one brief service interruption, which occurred after NTE had discovered that Kenny gave what NTE believes to be proprietary information to NTE's competitors. Second, NTE disputes Kenny's claim that the KCC Internal System is either better or materially different from NTE's product. Third, NTE disagrees with Kenny's characterization of the system transition as a "blind inventory" process. NTE points out that Perrich himself testified that during the transition, Kenny extracted information and reports from the NTE system and input that information into Ameren's system.

Fourth, NTE disputes Kenny's representation that Kenny used only two columns of factual information when it uploaded the NTE reports into the KCC system. NTE and Kenny fundamentally disagree about how to characterize the nature of the information that was taken from the NTE database and disbursed to, at various points, NTE competitors and Kenny clients. Where Kenny describes this information as mere raw factual data, NTE considers it to be proprietary data that was culled, programmed, and analyzed by NTE software.

Fifth, NTE claims that Kenny "encouraged and facilitated its customers' copying of NTE's data by creating user manuals to help its clients import NTE data into their own database." NTE cites materials that Kenny provided its client Nalcor, in which Kenny explained how to complete such tasks as "Import new Item Inventory from NTE," "Import Material Receiving Reports from NTE," and "Import Fresh Copy of Inventory from NTE." Kenny denies any intent to export information and illicitly transfer it into a new system, claiming that the user manuals merely contained instructions on how to use

5

information in the NTE reports and that Kenny paid NTE to generate and provide access to their reports for exactly this purpose.

Finally, NTE alleges that Kenny took NTE's barcodes and replaced them with different barcodes, while Kenny insists it created its own barcodes and used a new tracking system that was not derived from NTE's system. The record in this case is unclear and contradictory with regards to Kenny's mechanism for replacing NTE barcodes with Kenny barcodes as well as any distinction between the two sets of barcodes.

**III. The Contract Dispute**

On January 8, 2014, several months prior to the service difficulties and development of the KCC Internal System, NTE and Kenny signed a second agreement to cover an initial term of six months. Kenny had the option to extend the agreement for an additional six months if it communicated its intent to do so by May 1, 2014. The parties dispute whether or not this option was exercised and produced numerous conflicting documents in support of both propositions. According to Kenny, after the initial agreement expired on July 8, 2014, the relationship between the two companies was converted to a month-to-month contract. Kenny continued to pay monthly invoices for July, August, September, October, and November 2014. In December 2014, Kenny did not pay its monthly invoice, which it considers a termination of the month-to-month contract. NTE—believing they were operating under the extension option of the original contract—considers Kenny's failure to pay the December 2014 invoice to be a breach of contract.

In support of its contention that there was no extension to the contract, Kenny produced several emails from NTE representative Robert Rocque ("Rocque"). In one dated May 6, 2014, Rocque wrote Karl Miller ("Miller") of Granite Construction, "Please bear in mind that the May 1st deadline to extend the current agreement for six more months has passed, without notice from KCC/Granite." A

July 3, 2014 email from Rocque to Miller elaborated somewhat obliquely on the state of the relationship with NTE, stating in part, "I have instructed the NTE accounting team to send to Kenny/Granite an invoice(s) for the NTE service month of July. During our prior conversation, you, Mike and I agreed to treat July in isolation in order to provide time to complete a longer agreement, at a rate of $100K for the month. The rate for July 2014 does not affect the current agreement or negotiations on future long term agreement." Finally, a third email dated September 29, 2014 stated, "Please use the same billing process as you did last month to KCC. We don't have a signed agreement as of this moment." However, NTE argues this last email refers only to a Master Agreement, not the six-month extension that NTE contends was operative at that time.

NTE also produced an email sent to Rocque by Kenny employee Stacy Southern ("Southern") on May 6, 2014, stating in part, "As was discussed between you and Karl prior to May 1, 2014, KCC is extending the current agreement for an additional 24 months with an addendum outlining the new pricing and some additional modifications to the current contract. We believe that the addendum can be executed expeditiously; however, if for some reason, the parties cannot agree then KCC will be extending the current contract for the additional 6 months per the notification that Karl gave to you and you accepted."

In December 2014, NTE filed a copyright infringement, misappropriation, and breach of contract suit against Kenny and certain of Kenny's customers.[1] Kenny filed its motion for summary judgment in November 2015.

## DISCUSSION

**I. Copyright Infringement and Proprietary Information Claims**

A plaintiff alleging copyright infringement must prove "(1) ownership of a valid copyright,

---

[1] Former Defendants Ameren, Arizona Public Service Co., Electric Transmission Texas, and Nalcor have been dismissed from the case.

and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone service Co., Inc.*, 499 U.S. 340, 361 (1991). It is well-settled that facts alone are not copyrightable, while compilations of facts typically are as long as they demonstrate some degree of originality. *Id*. at 344-345; 17 U.S.C. § 103(a). Compilation is defined as "a work formed by the collection and assembly of pre-existing materials or of data that are selected, coordinated, or arranged in such a way that the resulting work, as a whole, constitutes an original work of authorship." 17 U.S.C. § 101. "[O]riginality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way. It is equally true, however, that the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard of originality is low, but it does exist." *Feist*, 499 U.S. at 362. Even when a compilation is copyrighted, the constituent facts that make up the compilation are not, themselves, protected. "[C]opyright protects only the elements that owe their origin to the compiler—selection, coordination, and arrangement of facts." *Feist*, 499 U.S. at 359; *see also Assessment Techs. of WI, LLC. v. WIREdata, Inc.*, 350 F.3d 640, 644 (7th Cir. 2005).

Here, Kenny challenges both prongs of the copyright infringement tests, arguing in the first instance that NTE's database lacks the originality sufficient to qualify for copyright protection and in the second that Kenny's extraction and use of information in the NTE database did not constitute copying.

**A. Scope of NTE's Copyright**

The parties disagree as to whether NTE's copyright encompasses data that is inextricably linked to NTE's system of bar code tracking, such as the date and location that materials in Kenny construction projects were received, moved, or issued. NTE argues that these items are included in the copyright, not as unadorned facts but as part of an original compilation. Here, NTE says the originality arises from the "association of bar code numbers with inventory" and the "selection, creativity, and judgment in selecting which information to include." NTE claims that the raw data's value comes only

8

from its relationship to the NTE barcodes and its contextual meaning within the NTE system, and it is this created meaning—not the bare facts themselves—that Kenny allegedly extracted and that NTE argues is subject to copyright protection. NTE cites numerous cases where courts have found sufficient originality to protect compilations of facts that are similar to the compilation at issue here, including a factual compilation of yacht listings, *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1134 (11th Cir. Fla. 2007); maps dividing the United States into distinct television marketing regions, *Nielsen Co. (US), LLC v. Truck Ads, LLC*, 2011 WL 3857122 (N.D. Ill. 2011); and electronic parts catalogs for clients in the automotive and heavy equipment industries, *Snap-On Bus. Solutions Inc. v. O'Neil & Assocs.*, 708 F. Supp. 2d 669, 685 (N.D. Ohio 2010) (plaintiff had valid copyright in database where plaintiff organized defendant's data "in an original data tree and create[d] relationships between the levels of the tree that would not otherwise exist").

By contrast, Kenny asserts that the NTE's copyright only extends to the particular data selection, arrangement, and coordination in the NTE system and not to simple collections of facts. Kenny considers the contested data to be factual information with meaning independent of its relationship to NTE's system. Defined in this way, the data would belong to Kenny under both the common law and the terms of the January 2014 agreement between the parties.

As discussed above, the threshold of originality required to enforce a copyright is low. *Feist*, 499 U.S. at 345 ("[T]he requisite level of originality is extremely low . . . The vast majority of works make the grade quite easily."). In an analogous case, the Seventh Circuit found that a real estate assessment program that organized and arranged data met the originality requirements "because no other real estate assessment program arranges the data collected by the assessor in these 456 fields grouped into these 34 categories, and because this structure is not so obvious or inevitable as to lack the minimal originality required . . . as it would if the compilation program simply listed data in an alphabetical or numerical

order." *Assessment Techs.* 350 F.3d at 643 (citations omitted). Here, too, NTE's organization and selection system—in particular the barcode system—is sufficiently original to extend copyright protection to the NTE program's specific arrangement and organization of the data.

Thus, I find that NTE's valid copyright does extend to the selection, arrangement and coordination of the data in the NTE system, including the particular way in which NTE's barcodes imbue the data with meaning. But this does not end the inquiry, for as we shall see below, the fact that raw data is entangled with copyrighted technology does not automatically render extraction of the data an infringement.

**B. The Proprietary Information Claims (Counts IV, V, VII and VIII)**

Kenny insists that it extracted only the raw data that it already owns from the NTE database, and describes NTE's contribution as providing an "empty database that was filled with data from Kenny's work sites." Unsurprisingly, NTE firmly rejects this characterization and argues that the data is empty of meaning without the organizing principle and tracking history provided by NTE's barcodes. I do not consider NTE's product to be merely an empty database, but, as the Seventh Circuit has intimated, Kenny may be entitled nonetheless to retrieve its raw data even when that data is somewhat intermingled with NTE software.

In *Assessment Techs.*, the Seventh Circuit declared that it could constitute "copyright misuse" to prevent a company from utilizing its own data. *Assessment Techs.*, 350 F.3d at 646-47. While the facts of that case involved data that was more easily extricable from copyrighted arrangement and selection processes than the Kenny data is from the NTE system, the court in *Assessment Techs.* did contemplate a situation like the one at hand and concluded, "AT [the copyright holder] would lose this copyright case even if the raw data were so entangled with [AT's product] that they could not be extracted without making a copy of the program." *Id*. at 644-45. Of course, Kenny did not make a literal

10

copy of NTE's system, but it did borrow the idea of a barcode system and extracted historical data whose meaning was inextricable from its relationship to NTE's copyrighted selection and arrangement process. The Seventh Circuit opined, however, that such a case would be governed by a Ninth Circuit opinion holding that "intermediate copying" of a copyrighted operating system was a fair use, "since the only effect of enjoining it would be to give [the copying party] control over noninfringing products." *Id.* at 645, citing *Sega Enterprises Ltd. V. Accolade, Inc.*, 977 F.2d 1510, 1520-28 (9th Cir. 1992). Here, after extracting the NTE reports, Kenny ended up in possession only of data that it undeniably owns or is in the public domain, which is to say the facts pertaining to the location of Kenny's materials across time. The contested data was input into the NTE system by Kenny in the first place and does not cease to belong to Kenny just because it is manipulated by a copyrighted software system.[2] *Feist*, 499 U.S. at 359. Just as in the *Assessment Techs.* hypothetical, Kenny's activities may have skirted the boundaries of the copyright, but ultimately only served to give Kenny control over noninfringing products. Therefore, I am granting Kenny's motion for summary judgment with respect to the proprietary information claims.

**C. The Copyright Claims (Counts I and II)**

NTE's copyright claims pertain to Kenny's alleged infringement of proprietary data as well as the alleged reverse engineering of NTE's system to design the KCC Internal System. "The Seventh Circuit uses the substantial similarity test to determine whether a copyright has been infringed." *Skyline Design, Inc. v. McGrory Glass, Inc.*, 2014 WL 258564 at *5 (N.D. Ill. 2014) (citing *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508-09 (7th Cir. 1994)). This two-part test asks 1) "whether the alleged infringer had access to the copyrighted work" and 2) "whether an ordinary observer would consider the allegedly infringing work to be substantially similar to the copyrighted work." *Id.* (citations omitted).

Here, access is established via Kenny's documented, contracted-for use of the NTE system.

---

[2] Kenny also argues that it was authorized to remove the data and export reports by the terms of the January 2014 agreement. There is no need to examine this argument, as the analysis above resolves the claim in Kenny's favor.

However, the record is not developed enough for an "ordinary observer," let alone a jury, to determine if the KCI Internal System meets the substantial similarity test. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . ." *Celotex Corp.,* 477 U.S. at 323–24. Here, NTE has provided very little evidence that the KCC Internal System is actually modeled on or structurally related to the NTE system, except insofar as both systems made use of a barcode tracking system. Even in that regard, there is no evidence that Kenny's barcodes utilize the same selection, arrangement, or organization scheme as NTE's barcodes. NTE alleges, but does not support, that Kenny simply replaced NTE's barcodes with different codes generated by Kenny, and further points to Kenny's extraction of two columns of data from the NTE system. But neither of these allegations speaks to whether Kenny copied NTE's selection, arrangement, and coordination scheme, which are the only copyrighted elements of its work. Thus, because the record does not provide enough evidence for a reasonable jury to find in favor of the Plaintiff, I am granting Kenny's motion for summary judgment on the copyright claims.

## II. Unpaid Fees Claim (Count VI)

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. at 248. "[W]eighing the evidence and determining the credibility of witnesses are functions of the jury, not this Court." *Equal Employment Opportunity Comm'n v. Costco Wholesale Corp.*, 2015 WL 9200560, at *9 (N.D. Ill. 2015).

As outlined above, the factual record regarding the alleged extension of the contract is riddled with contradictions and conflicting accounts. Both sides produced emails in support of their respective positions, but neither offers enough context to corroborate or clarify the state of the contract. Just as the May 6, 2014 email from Robert Rocque indicated that the deadline to extend the agreement had passed without renewal, an email from Stacey Southern on the same day noted that Kenny still believed it

would be able to exercise the 6-month extension option. The September 29, 2014 email stating "We don't have a signed agreement as of this moment" is also inconclusive, as both parties offer plausible interpretations that ultimately raise questions of credibility, which are not appropriate for this Court to decide on a summary judgment motion. Because the evidence presented on this count is sufficiently disputed that a reasonable jury could return a verdict in favor of either party, I deny Kenny's motion for summary judgment with regard to Count VI, the unpaid fees claim.

## CONCLUSION

For the foregoing reasons, Defendant Kenny's Motion for Summary Judgment is granted in part and denied in part. The parties shall prepare for trial on Count VI of the First Amended Complaint, the only count remaining.

ENTER:

James B. Zagel
United States District Judge

DATE: April 25, 2016